310 So.2d 626 (1975)
Dana Gay Seal BERRY
v.
Kenneth Dale BERRY.
No. 55465.
Supreme Court of Louisiana.
March 31, 1975.
Rehearing Denied April 25, 1975.
H. F. Sockrider, Jr., Booth, Lockard, Jack, Pleasant & LeSage, Shreveport, for plaintiff-applicant.
C. R. Whitehead, Jr., Whitehead & McCoy, Natchitoches, for defendant-respondent.
*627 DIXON, Justice.
This is an action for a judgment of separation from bed and board filed by Dana Berry. The only issue raised by this application is whether the trial court was a court of proper venue for this action. In separation and divorce cases venue is "jurisdictional" in nature and cannot be waived. C.C.P. 3941. The trial court determined that it was not a court of proper venue and therefore dismissed the action. The Court of Appeal affirmed this action. 300 So.2d 246 (La.App.1974). We reverse.
The Berrys were married on June 2, 1973 in Shreveport and immediately established their matrimonial domicile in Natchitoches. On July 10, 1973 the parties had an argument, first, concerning the husband's previous divorce, and then about the wife's refusal to go to bed with the husband. There had been arguments for a period of about three weeks. The husband became very depressed on this night, picked up a loaded shotgun and informed his wife that he was going to "end it all."
The next day the wife left the matrimonial domicile and moved to Bossier Parish to the home of her parents.
The Court of Appeal correctly stated the lawthat a wife has no domicile other than that of her husband (C.C. 39; C.C. 120), but may acquire a domicile separate from that of her husband if she is abandoned, or if her husband's misconduct justifies her leaving. Smith v. Smith, 43 La.Ann. 1140, 10 So. 248 (1891); Bush v. Bush, 232 La. 747, 95 So.2d 298 (1957).
The Court of Appeal also correctly stated that the husband's misconduct which would justify the wife's establishing a separate domicile is "substantially equivalent" to conduct which would constitute grounds for a separation.
But the Court of Appeal held that the husband's misconduct in this case did not justify the wife's leaving.
On the trial of the exception to jurisdiction and venue, only two witnesses were calledthe plaintiff and the defendant. The transcript of testimony is only fifteen pages long. The young couple's recitation of the events on the night preceding the separation is laconic. We repeat portions relevant.
The husband testified:
"A I got angry at her but it didn't have anything to do with the lawyer.
"Q Well, what did you get angry about?
"A We had an argumentbecause she repeatedly refused to go to bed with me.
"Q Did you have anything to drink that night?
"A I believe I drank two beers that night, yes sir.
"Q As alleged, did you get a gun that night?
"A I picked the gun up and walked out of the room with it. I sure did. But I did not threaten her with it.
"Q What kind of gun was it?
"A It was a shot gun.
"Q Was it loaded?
"A Yes sir it was.
"Q And when you say you walked out of the room, what room was that?
"A We was in the bedroom and I picked the gun up, it was sitting in the corner, and I picked the gun up and left and she stayed in the bedroom.
"Q Did you say anything when you left with the gun?
"A I don't rememberI don't really remember if I said anything, but I know I did not threaten to kill her with it.
"Q Did you later come back in the room and unload the gun?
*628 "A Yes I did.
"Q Did you make the statement that she was not worth shooting?
"A No sir. I made the statement that she was not worth killing myself over.
"Q All right, then what happened after that?
"A I think we stayed up for awhile. I later went to sleep. I don't know whatI think she stayed up the rest of the night and I don't really know. She said she did, but I don't know. I was asleep.
"Q Did you make the statement the next day after this incident that night, did you make a statement to her that she would be responsible for what may happen to you?
"A I don't really remember if I said that. I know I was emotionally upset and I seriously consideredI didn'tI wasn'tI didn't know if I wanted to kill myself. I was really upset because we had had many quarrels over our sex relationship and I was in such adeep depression and emotional state, I considered killing myself but I don't know if I said that she would be responsible for it.
"Q And do you know what she stayed up all that night?
"A Well, as I said, I'm sure that she was as much emotionally upset as I was and we had this trouble with our marriage and she was under a strain. She had been crying, so I guess she was just emotionally upset if she stayed up all night.
"Q In your opinion, she was upset that night, is that correct?
"A Yes sir, she was upset."
The wife testified:
"Q Were you afraid of him?
"A Yes I was.
"Q Now, he testified that you all were in the bedroom, is that correct?
"A That is correct.
"Q And he testified that he took shot gun that was in the bedroom, is that correct?
"A That is correct.
"Q He said he did not point it at you.
"A He stood in front of me with the gun and told me that he was tired of my he had a word he used, and that he was going to put an end to it right now. And I was afraid, not only for myself but what he might do to himself.
"Q You were afraid for what he might do to you?
"A For what he might do to me and for himself.
"Q And you were afraid that he might harm himself?
"A I was afraid for my life.
"Q Did you make any attempts to run or anything like that?
"A No I didn't. When he made the statement, he stood there a minute and turned around, there were no lights on in the other part of the house and he went, evidently, into the living room and stayed for a long time. And when he returned, he unloaded the gun on the bed and told me that I wasn't worth it.
"Q Did he say that you were not worth shooting?
"A He said you are not worth what I was about to do.
"Q Were you still afraid of him?
"A Yes I was.
"Q Now, did he go to bed in the bedroom?
"A Yes he did.
"Q And when he did, did you leave the bedroom?
*629 "A Yes.
"Q Where did you sleep, if any, that night?
"A I made a pot of coffee and stayed up. I had a chemistry test the next morning.
"Q You stayed up for what reason?
"A I was afraid.
"Q You were afraid of him. Did you make plans that night to leave?
"A I knew in my mind that I was leaving. I made no plans to try to get in touch with my parents until the next day.
"Q Were you going to leave because you were afraid of him?
"A Yes I was afraid.
"Q Did you all have arguments about sex, he would want to have sex
"A Arguments about everything.
"Q And you were thinking then about maybe leaving him, is that correct?
"A No, I was not about to leave him until the first night that he pulled a gun, and I left the next day.
"Q This one instance is when you made up your mind to leave, is that correct?
"A I was scared to death."
The law should not require one spouse to remain in the house with the other emotionally upset, brandishing a loaded shotgun, making threats to "end it all." It would be unrealistic to fail to recognize the fear and despair of an unarmed young woman, married less than six weeks, who found herself in such a situation. It is conduct of such a nature to render future cohabitation insupportable. Acts of physical cruelty are not the only kind of cruel treatment which will justify abandonment by the mistreated party. Moore v. Moore, 192 La. 289, 187 So. 670 (1939); Schneider v. Schneider, 214 La. 759, 38 So.2d 732 (1949).
Therefore the judgments of the courts below are reversed, the exceptions to the jurisdiction and venue are overruled, and the case is remanded to the district court for further proceedings, at the cost of defendant.
SUMMERS, Justice (dissenting).
I would not disturb the finding of fact of the trial court and court of appeal. Accordingly, I dissent.